## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **PHYLLIS D. GOSA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL NO. 16-0055-CG-B** |
| | ) | |
| **WAL-MART STORES EAST, LP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Wal-Mart Stores East, LP's ("Wal-Mart") motion for summary judgment (Doc. 12), Plaintiff Phyllis D. Gosa's ("Gosa") response (Doc. 21), and Wal-Mart's reply (Doc. 25). Having considered the vast evidentiary record, with no hearing being necessary, the Court deems it proper to **GRANT** Wal-Mart's motion. The Court also considers Wal-Mart's motion to strike (Doc. 27) Gosa's Affidavit (Doc. 21-4) in whole or in part, and Plaintiff's response in opposition (Doc. 28) and finds the motion to be **MOOT** for the reasons stated below.

### I. Background

Gosa, formerly a pharmacist employed by defendant, originally filed her five-count suit alleging race and gender discrimination and related causes of action in the Circuit Court of Dallas County, Alabama. (Doc. 1). Wal-Mart properly removed the case to this Court, and after discovery moved this Court for summary judgment as to all five claims. (Docs. 1, 12).

A.    **Wal-Mart's Pharmacy Operations**

Many of Wal-Mart's shopping centers offer pharmaceutical services to its customers. Wal-Mart employs licensed pharmacists in its stores, including the Pharmacy Manager and Staff Pharmacists. When a permanent manager is not available in a store, a Staff Pharmacist is elevated to a Pharmacist in Charge (PiC) temporarily to fill the role. This temporary elevation comes with a one dollar per hour raise, which reverts to a Staff Pharmacist's original salary at the end of the PiC role. (Doc. 14-12, ¶ 11). Pharmacy Managers oversee the pharmacy operation in a particular store, including managing the prescription stock, completing evaluations for pharmacy staff, and being held accountable to the Alabama State Board of Pharmacy for maintenance and security. (Doc. 14-4, p. 4). Staff Pharmacists "fill[ ] prescriptions and consult[] [with] customers" while also supervising the general pharmacy operations and overseeing hourly pharmacy staff. (Doc. 14-12, ¶ 3). In addition to pharmacists, Wal-Mart employs over-the-counter (OTC) clerks, pharmacy technicians, and cashiers. *Id.* Generally, pharmacists working on a shift are tasked with "training [Pharmacy Technicians] to the proper standard." *Id.*

Wal-Mart pharmacies operate out of individual stores and, thus, are subject to a dual chain of command. (Doc. 14-11,¶ 4). Pharmacy personnel report to the individual store's management as well as to the Health and Wellness Division. *Id.* Mr. Rusty Harris and Ms. Krystal Powe serve as Market Health and Wellness Directors in Alabama, and both have supervised

2

Gosa. (*See id.* at ¶ 7; Doc. 14-12, ¶ 2). Mr. Chad Souers is the Regional Health and Wellness Director for most of Alabama and the panhandle of Florida. (Doc. 21-10, p. 4).

When hiring pharmacists, Wal-Mart considers a variety of factors, including lateral hires' prior experience and prior salary, the size of graduating pharmacy classes for new hires, and relocation incentives or other convenience factors. (*See* Docs. 14-11, ¶ 8; 14-12, ¶¶ 11–12). Mr. Harris personally attends recruiting events at Alabama's two pharmacy schools, but the Regional Talent Specialist also recruits at two historically black universities in the southeast—Xavier University in Louisiana and Florida A&M. (Doc. 14-1, p. 12).

**B. Gosa's Employment at Wal-Mart**

Gosa first began working at Wal-Mart Store number 700 in Selma, Alabama in September 2003. (Doc. 14-1, p. 3). She remained in her Staff Pharmacist role for the vast majority of her career, with the exception of her year as a PiC from 2006 through June 2007. *Id.*; *see also* Doc. 14-3, p. 20. She resigned from her position as PiC and voluntarily returned to her role as a Staff Pharmacist. (Doc. 14-3, p. 20). In the spring of 2015, before her resignation, Gosa was transitioning back into the PiC role. (Doc. 14-12, ¶ 9). Gosa did not have an employment contract with Wal-Mart and worked as an employee at-will. (Doc. 14-1, pp. 8–9).

3

During her time at Wal-Mart Store 700, Gosa worked with varied pharmacists: Pharmacy Managers included Louie Hubert (Caucasian male), Lennie Allen Ezelle (Caucasian male), Greg Crane (Caucasian male), and Angie Lovingood (Caucasian female); Jean Spence (Caucasian female) worked as a PiC and a Staff Pharmacist; other Staff Pharmacists included Vincent Azzarello (Hispanic male) and Philip Lyman (African-American male). (*See* Doc. 14-4, p. 15; Doc. 13, pp. 4–5).

Gosa also worked with different Pharmacy Technicians, OTC staff, and cashiers. These included Christy Baynes-Calhoun, Tamika Ragland, Terrika Frison, Shondra Jackson, Nancy DeWitt, and Tiffany Lewis. All of these Wal-Mart associates are female, and all, except Ms. DeWitt, are African-American. (Doc. 14-4, p. 15). As a Staff Pharmacist, Gosa was responsible for supervising these employees, especially when she was the only pharmacist on duty. Gosa had written up pharmacy associates on different occasions for violating Wal-Mart policy. (*See* Doc. 14-3, pp. 8–9, 11, 23–25).

### C. Gosa's Coaching Reports

Wal-Mart issues a written "coaching" when an employee has violated its policy as a method of holding its employees accountable. (Doc. 21-1, p. 7). The first coaching "does not require the associate being coached to acknowledge it" in the computer system. *Id.* at 11. If an associate receives a second or third coaching, he or she must acknowledge it. *Id.* If an associate commits another policy violation after the third coaching, the associate is

automatically terminated. *Id.* These coachings generally expires a year after they are issued.

Gosa received three coachings between August 2014 and February 2015. Gosa garnered her first coaching in August 2014 for asking an African-American pharmacy technician, Ms. Jackson, to leave the pharmacy to obtain documentation of the approval of her ADA accommodation for a stool. (*See* Doc. 14-3, pp. 26–27). Using a stool in the pharmacy without an accommodation violates Wal-Mart policy, and Gosa was unaware of any request for or approval of Ms. Jackson's stool. (*See* Doc. 14-4, p. 7; Doc. 14-3, p. 27). According to Mr. Harris, Gosa questioned Ms. Jackson's accommodation and "made some derogatory comments to Ms. Jackson about the accommodation itself." (Doc. 14-4, p. 13). Gosa vehemently denies making any such comments, but the investigation by Wal-Mart, which included interviews of the staff working in the pharmacy at the time in question, determined she had made inappropriate remarks. *Id.* As a result, Gosa received a coaching for violating Wal-Mart's policy to respect the individual. (Doc. 14-3, p. 26).

The second coaching, given in November 2014, concerned Gosa's breach of Wal-Mart's policy relating to the removal of personal health information (PHI) of patients from the pharmacy at the end of her shifts. Gosa admits she recorded PHI in a notebook to note incoming phone prescriptions and other intake methods. She further admits that she took her

5

notebook home with her. (*See* Doc. 14-2, p. 8). Wal-Mart policy prohibits the removal of PHI from the pharmacy for any reason, as the removal presents a possible HIPPA breach. (Doc. 14-4, pp. 8–9). During the investigation of Gosa's breach of the PHI policy, she accused two other pharmacists, Mr. Ezelle and Mr. Hubert (both Caucasian males) of committing the same policy violation. Wal-Mart investigated her claims and determined Mr. Ezelle breached the policy because he, like Gosa, removed his notebook from the pharmacy at the end of his shifts. *Id.* Mr. Hubert, however, did not remove the PHI from the pharmacy and properly destroyed the notebooks. *Id.* As such, Mr. Ezelle received a coaching, but Mr. Hubert did not. *Id.*; *see also* Doc. 14-7, pp. 4–5.

Gosa received her final coaching in February 2015 for leaving the pharmacy unsecured while she reprimanded an associate in the Health and Beauty department, a section of the store adjacent to the pharmacy. (*See* Doc. 13-4, p. 35). According to Mr. Harris, Wal-Mart's pharmacy operation manual (POM) 902 provides Wal-Mart's policy regarding pharmacy area security. (*See* Doc. 14-4, p. 4). Mr. Harris explained the policy:

> Pharmacists should—if there's only one pharmacist on duty, they should only leave the pharmacy unsecured if they are going out to the over-the-counter area to help a patient or customer with an over-the-counter question. [. . .] If it's the health and beauty aids and helping a customer with an item, that's fine, but there are **no other business reasons that are considered acceptable**.

*Id.* (emphasis added). If the pharmacist must leave the area for any other reason, even for "business reasons other than helping a customer," the pharmacy must be secured. *Id.*; *see also* Doc. 14-12, ¶ 4. To be secure, all other personnel must exit the pharmacy, the gate must be brought down and locked, and the door must be locked. *Id.* Gosa does not contest she left the pharmacy unsecured while she went to an aisle in the health and beauty section to speak with an "insubordinate associate." (Doc. 14-2, pp. 12–13). Because she left the pharmacy for a reason other than assisting a customer, Gosa received a coaching. Gosa, however, was not the only associate who received a coaching for violating POM 902. Vincent Azzarello, a Caucasian/Hispanic male, received two coachings for violations of POM 902, one of which occurred while he was working in Store 700. (Doc. 14-4, p. 6; 14-9, pp. 3–4). Mr. Harris also stated Kim Kurcz,[1] a Caucasian female in his district, also received coaching for violating POM 902. (Doc. 14-4, p. 6). He further testified he was unaware of any other situation in which a pharmacist had left the pharmacy unsecured and had not received a coaching.[2] *Id.*

**D. Gosa's Performance Evaluations**

---

[1] The name "Kurcz" is spelled as such in Mr. Harris's deposition but appears as "Kurucz" in his Affidavit (Doc. 14-11, ¶ 6).

[2] In his Affidavit, Mr. Harris identifies three additional pharmacists in his district who have been coached recently for a POM 902 violation. They are two Caucasian men and one African-American man. *Id.*

Gosa received annual and mid-year performance reviews during her tenure at Wal-Mart. The record contains evaluations from Fiscal Year (FY) 2011 through FY 2015. (Doc. 21-7). In her FY11 Annual Management Performance Evaluation, Gosa received an overall rating of "Exceeds Expectations." (Doc. 21-7, p. 3). Her then-manager Mr. Hubert gave glowing commendations of her ethical standards and thought she might have an opportunity in the future in a management position. *Id.* In her FY12 Mid-Year Performance Evaluation, Mr. Hubert again rated her highly at "Exceeds Expectations." *Id.* at 10. In her FY12 Annual evaluation,[3] however, Mr. Hubert lowered her overall rating to "Solid Performer." *Id.* at 13. She received the same rating in FY13 Annual Performance Evaluation. *Id.* at 20.

Mr. Crane became the Pharmacy Manger in 2014, and he oversaw Gosa's FY14 Annual Performance Evaluation. In FY14, Gosa received a rating of "Development Needed," the second lowest rating. *Id.* at 24. In his comments, Mr. Crane noted Gosa "adheres to assigned schedules" and demonstrated concern for "patient welfare." *Id.* He further noted, however, Gosa did not exhibit a team effort or take advantage of opportunities available to her. Mr. Crane stated,

> During my time at this store, I have felt continually undermined by [Gosa] in my attempt to build a cohesive

---

[3] Gosa contends Gene Crane improperly handled her FY12 evaluation, as his name appears on the form even though he was not working at Wal-Mart at the time. Mr. Crane explained the computer system attached his name when he viewed the record but that he did not in any way alter the information. (Doc. 14-6, p. 5).

functional department. This began with her refusal to ever
attend any scheduled departmental meetings as well as
her only being willing to hold certain associates
accountable for policy violations. She has complained
about communication within the department but really
has desired for communication to be only one direction, not
a two way street. These issues have led directly or
indirectly to poor job satisfaction among our staff
members[,] and this split has contributed to the loss of a
number of long term associates. Her refusal to become a
certified immunizer crippled the ability of our store to
provide this much needed service to our customers.
Refusal to acknowledge her shortcomings in these areas
and to rise above self interest and bridge the gaps with
other staff members, though asked to do so directly, has
led to the store not being as functional as necessary . . . .
Rather than helping build a cohesive team, she has chosen
to foster cliques and divide the staff at every opportunity.
All of this has been done in spite of direct communication
with field management to do otherwise. When confronted
with these issues, and others, she chooses to play the
victim or being unaware of policy violations.

*Id.* at 22–23. In FY15, Mr. Crane again provided comments to Gosa's Annual

Performance Evaluation, but Ms. Powe assigned the ratings. (*See* Doc. 14-6,

p. 9). That year, Gosa received a "Solid Performer" rating, although the notes

reflect she had yet to become a certified immunizer and needed to "become a

uniter" in the team. (Doc. 21-7, p. 29). Despite these downward-trending

reviews, Gosa was in the process of transitioning into the PiC role when she

resigned. (*See* Doc. 14-12, ¶ 9).

**E. Gosa's Resignation**

On April 26, 2015, Gosa and Pharmacy Technician Tiffany Lewis were

involved in an incident. Ms. Lewis, a relatively new technician, worked a

weekend shift with Gosa and requested some assistance in calculating

9

dosages and other guidelines for working in the pharmacy. (*See* Doc. 14-12, p. 13). According to Ms. Lewis's incident report, Gosa became hostile, "questioned [her] intellect," and—in Lewis's view—refused to assist or train her. During the confrontation, Gosa shut down Ms. Lewis's work station. *Id.* at 15. Ms. Powe learned of this incident and "requested store management to obtain a written statement from Ms. Gosa, so we could more fully understand the facts and circumstances of what had occurred." *Id.* at ¶ 8.

Gosa indicates she became alarmed at Ms. Lewis's lack of training because she felt Ms. Lewis was unprepared to work as a Pharmacy Technician. (*See* Doc. 14-1, pp. 11–12). Gosa claims she had completed a write-up of the incident with Ms. Lewis when an assistant store manager approached her at approximately 7:00 P.M. on April 29th asking her to fill out more paperwork. *Id.* at 22. Around 7:50 P.M., Gosa called Ms. Powe to resign her position, stating she was "resigning effective immediately slash right now" because she was "tired of this." *Id.* When asked to explain what she meant, Gosa stated, "[h]aving people show up in front of everyone and asking me to do reports about situations that I had not been effectively talked to about it. So I was just tired." *Id.* Gosa further indicated she was frustrated because she had been unable to obtain any feedback or information from Ms. Powe or store management on how the situation with Ms. Lewis would be handled. (Doc. 26-1, pp. 3–4). Ms. Powe accepted her resignation, which became effective that same day. (Doc. 14-12, ¶ 8).

After Gosa's resignation, Wal-Mart transferred Ms. Sharonda Martin, an African-American female, to Store 700 from a Wal-Mart store in Marietta, Georgia. (Doc. 14-12, ¶ 10). Because Ms. Martin transferred from a metropolitan area to a more rural area, Wal-Mart offered her a "larger salary increase and [paid] relocation costs." *Id.* at ¶ 12.

## F. Gosa's Complaint to the Alabama State Board of Pharmacy

Shortly after her resignation, Gosa wrote a formal complaint to the Alabama Board of Pharmacy. She indicated her concern that Wal-Mart employed technicians without enough experience and stated, "I resigned as a staff pharmacist at the store because of my concern for the safety and wellness of the public." (Doc. 14-2, p. 26). On May 27, 2015, the Board acknowledged Gosa's complaint and initiated an investigation into Wal-Mart store 700. (Doc. 14-3, p. 2). In its final letter, on September 18, 2015, the Board informed Gosa, "[a]n investigation (Case 15–0078) resulted in no viable evidence to support a hearing by the Alabama State Board of Pharmacy." *Id.* at 3.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) instructs, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's mission is to "determine whether there is a genuine

issue for trial" and not to "weigh the evidence." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The burden is on the moving party to show that there is no genuine dispute as to any material fact. *Id.* at 256. In conducting its summary judgment analysis, the Court must construe all evidence "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

After the movant meets its burden, the burden shifts to the nonmoving party "to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the nonmoving party fails to do so, the "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. Further, Rule 56 "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. Wal-Mart's Motion to Strike

Before addressing the substantive portions of this Order, the Court turns to Wal-Mart's motion to strike (Doc. 27) Gosa's Affidavit (Doc. 21-4) in whole or in part. With the December 1, 2010 rules change to Rule 56 of the Federal Rules of Civil Procedure, motions to strike submitted on summary judgment are no longer appropriate. Revised Rule 56(c)(2) provides, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The Advisory Committee Notes specify as follows:

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

FED. R. CIV. P. 56, Adv. Comm. Notes, "Subdivision(c)" (2010 Amendments). As such, the Court construes the Defendants' motions as Objections, to be overruled or sustained, and finds the motions to strike to be **MOOT**.

Wal-Mart objects to vast portions of Gosa's Affidavit on the basis that it fails to proffer relevant information, because it is cumulative of her pleadings and other evidence, and because some of her statements contradict her prior deposition testimony. (*See generally* Doc. 27; Doc. 25, pp. 1–3). A party may not create an issue of material fact with an affidavit that

13

contradicts previously given testimony without an explanation. *See Knight v. Fourteen D Enters., Inc.*, 995 F. Supp. 2d 1311, 1322 (S.D. Ala. 2014). Gosa has not provided any explanation as to why her testimony has changed, and the objections to the contradictory testimony in the Affidavit must be sustained. Further, all evidence must conform to the Federal Rules of Evidence, including Fed. R. Evid. 401. Rule 401 states "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. Moreover, this Court must also adhere to the restrictions of Rule 403, which allows exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. After considering the Affidavit and the record as a whole, the Court sustains the objections to the following paragraphs or portions of Doc. 21-4:

- Paragraph 2 will be stricken in its entirety, as it is mostly irrelevant and, if relevant, cumulative of the pleadings and deposition testimony.

- In Paragraph 3, the Court will strike the following phrases or sentences: "who were unused to, and therefore struggled with, African American female leadership, due to long standing [sic] traditions in our state"; "I encouraged management to recruit at historically black

colleges and universities in hopes of diversifying Walmart's Pharmacy
and hoping our community to create more just and fair traditions";
"who dismissed my complaint against Nancy Dewitt as far back as
2009 as 'drama'"; "[o]r in the case of Robert Holden, who insulted me
on several occasions, left shortly after coming to the Pharmacy."
Objections to these portions of the Affidavit are sustained because they
are irrelevant or outside the scope of the matter before the Court.

- The following sentence of Paragraph 4 will be stricken: "Especially,
  when other Caucasian pharmacists 'shopped the clock', a.k.a. shopped
  on company time for personal items quite frequently without
  consequence." The Court sustains this objection because it contradicts
  Gosa's deposition testimony.

- The Court sustains objections to the first four (4) sentences of
  Paragraph 5 (through the sentence beginning "In fact, Lennie Ezelle . .
  . .") because it is cumulative of prior testimony and because it is
  irrelevant as to race or gender discrimination.

- In Paragraph 6, the Court sustains objections to the phrases Gosa uses
  to describe discrimination that are outside the protected classes or
  gender and race, including "old and backwards," "bipolar," and
  "drama."

- The Court also sustains objections to the entirety of Paragraphs 9, 11,
  and 13 on the basis that they are cumulative.

- The final phrase "so I called that night to tell them 'I can't take it anymore'" of Paragraph 12 will be stricken, as it contradicts Gosa's deposition testimony.

- Wal-Mart's objections to Paragraphs 14 and 15 as cumulative to Gosa's (and others') testimony are sustained.

- The Court sustains objections to Paragraph 16 and will strike it entirely because it is not relevant to the case at hand.

Having addressed Wal-Mart's preliminary motion, the Court now turns to the substantive matter at hand.

## IV. Analysis of Plaintiff's Federal Claims

In her Complaint (*see* Doc. 1, Ex. A), Gosa outlines three claims relating to federal antidiscrimination laws. In an effort to view the facts in a light most favorable to her, as the nonmoving party, the Court construes her claims as follows: racial discrimination and retaliation under Title VII (Count II), racial discrimination under 42 U.S.C. § 1981 (Count III), and gender discrimination violating the Equal Pay Act, 29 U.S.C. § 206(d), and Title VII (Count IV).[4]

## A. Race Discrimination under Title VII and § 1981

Gosa's disparate treatment claims brought under Title VII and § 1981 all require proof of discriminatory intent, and each claim is analyzed in the

---

[4] Gosa's Complaint only alleges gender discrimination under the Equal Pay Act ("EPA"). Wal-Mart, however, has addressed both the EPA and Title VII in its motion, and the Court will do the same.

same manner. *See Bolton v. Baldwin Cnty. Publ. Schs.*, 47 F. Supp. 3d 1342,

1349 (S.D. Ala. 2014). "Discrimination claims brought under Title VII . . . are

typically categorized as either mixed-motive or single-motive claims." *Quigg*

*v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). As the

Eleventh Circuit explained, "[m]ixed-motive and single-motive discrimination

are different theories of discrimination, as opposed to distinct causes of

action. Specifically they serve as alternative causation standards for proving

discrimination." *Id.* at n. 4 (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, --

U.S. --, 133 S.Ct. 2517, 2530 (2013)). The Supreme Court has held "an

adverse employment action motivated by both legal and illegal reasons

constitutes actionable discrimination under Title VII." *Id.* at 1236 (citing

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). These mixed-motive

claims, like their single-motive sister claims, can be proved with either direct

or circumstantial evidence. *Id.* Wal-Mart proceeds under the single-motive

theory, and both parties concede no direct evidence exists. Thus, this case

turns on circumstantial evidence.

        The *McDonnell Douglas* framework for single-motive claims relying on

circumstantial evidence "established a three-part burden-shifting framework

for determining liability in discrimination cases." *Quigg*, 814 F.3d at 1237.

> Once the plaintiff has made out the elements of the prima
> facie case, the burden shifts to the employer to articulate
> a non-discriminatory basis for its employment action.
> *Texas Dept. of Community Affairs v. Burdine*, 450 U.S.
> 248, 253 (1981). If the employer meets this burden, the
> inference of discrimination drops out of the case entirely,

and the plaintiff has the opportunity to show by a
preponderance of the evidence that the proffered reasons
were pretextual. *St. Mary's Honor Center v. Hicks*, 509
U.S. 502, 511 (1993). Where the plaintiff succeeds in
discrediting the employer's proffered reasons, the trier of
fact may conclude that the employer intentionally
discriminated. *Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133, 148 (2000).

*Vessels v. Atlanta Independent Sch. Sys.*, 408 F.3d 763, 767–68 (11th Cir.

2005). Wal-Mart and Gosa agree Gosa must demonstrate 1) she is a member

of a protected class; 2) she was meeting Wal-Mart's legitimate work

expectations; 3) she suffered an adverse employment action; and 4) a causal

connection exists between the adverse employment action and her protected

class. (*See* Doc. 13, p. 12; Doc. 21, p. 10) (citing *Vessels*, 408 F.3d at 768). The

parties, however, appear to conflate the *prima facie* standard for disparate

treatment with an employer's well-established defense of legitimate

termination based on productivity or other work-related deficiencies. *See*

Calvo v. Henderson, Postmaster Gen., U.S.P.S., E.E.O.C. Doc. 01991005,

2000 WL 283819, at *1 (Feb. 29, 2000). Rather, this Court has traditionally

required evidence that the defendant treated similarly situated employees

outside of plaintiff's protected class more favorably to establish a race

discrimination claim. *See Powell v. Am. Remediation & Envir., Inc.*, 61 F.

Supp. 3d 1244, 1252 (S.D. Ala. 2014); *see also Surtain v. Hamlin Terrace

Foundation*, 789 F.3d 1239, 1244 n. 3 (citing *Holifield v. Reno*, 115 F.3d 1555,

1562 (11th Cir. 1997)).

While Wal-Mart proceeds on the traditional single-motive framework, Gosa requests this Court apply the recently adopted "mixed-motive" analysis to her Title VII claims as an alternative theory of liability. (*See* Doc. 21 pp. 20–21). This analysis rejects the traditional *McDonnell Douglas* burden-shifting framework for circumstantial evidence claims. *See Quigg*, 814 F.3d at 1236. In *Quigg*, the Eleventh Circuit adopted the Sixth Circuit's approach to mixed-motive claims: "That framework requires a court to ask only whether a plaintiff has offered 'evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action.'" *Id.* at 1239 (emphasis in the original) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)). Thus, in a mixed-motive framework, this Court must conclude "whether the 'plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision.'" *Id.* at 1239 (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003)). The Court now turns to the first theory of liability, the single-motive racial discrimination claim.

### 1. Single-Motive Racial Discrimination: McDonnell Douglas Framework

Gosa alleges Wal-Mart racially discriminated against her in many ways: 1) by coaching her for policy violations, which were committed by her Caucasian co-workers and did not result in discipline, 2) through her

lackluster performance evaluations by Gene Crane, which were racially motivated and resulted in missing a pay increase, and 3) by granting her Caucasian colleagues priority in scheduling.[5] To prevail under this theory, she must first establish a *prima facie* case of race discrimination, *see supra*. The parties agree Gosa is a member of a protected class as both an African-American and as a female. They also agree the three coachings constitute adverse employment action.

Wal-Mart, however, contends Gosa cannot establish a causal connection between the three coachings and Gosa's race because "the three coachings were based upon undisputed policy violations" and because Wal-Mart "issued identical coachings for other Pharmacists outside Plaintiff's protected class." (*See* Doc. 13, p. 12). The Court interprets the parties' discussions surrounding Gosa's coachings and the comparators' coachings to evidence discord regarding both the element of similarly situated employees being treated different because of race—a *prima facie* element—and legitimate, non-discriminatory practices as required in the second step of the

---

[5] Gosa also complains Mr. Harris ignored her encouragement to recruit from historically black colleges and universities for new pharmacists. The record, however, demonstrates Mr. Harris attended recruiting events at Auburn and at Samford solely because these two pharmacy schools lie within his district. The regional talent specialist, Michael Robinson, recruits from schools in the Southeast, including Xavier University in Louisiana and Florida A&M, both of which are historically African-America. (*See* Doc. 14-4, p. 12). As such, this particular complaint fails to imply any racial bias in Wal-Mart's recruiting policies.

*McDonnell Douglas* framework. The Court will address the three coachings as an element of the *prima facie* case first.

### a. The **Prima Facie** *Case: Comparators Analysis*

"[I]n cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that [s]he did not violate the work rule, or (b) that [s]he engaged in misconduct similar to that of a person outside of the protected class, and that the disciplinary measures enforced against [her] were more severe than those against the other persons who engaged in similar misconduct." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). Further, the conduct between the employees must be "nearly identical" so courts do not "second-guess[ ] employers' reasonable decisions and confus[e] apples with oranges." *Knight v. Fourteen D Enters., Inc.*, 995 F. Supp. 2d 1311, 1326 (S.D. Ala. 2014) (internal marks and citations omitted). Plaintiff failed to meet this burden, as demonstrated below.

Gosa's received her first coaching in August 2014 for asking Ms. Jackson to leave the pharmacy to obtain documentation for the approval of her ADA accommodation (a stool). After Wal-Mart investigated the incident, Gosa received a coaching for violating Wal-Mart's policy to respect the individual. (Doc. 14-3, p. 26).  Unlike the next two coachings, the record does not contain evidence that other staff members committed similar policy violations. Comparators testified they would generally accept the associate's

word that the accommodation had been approved and would speak separately

and privately to store management to confirm the approval. (*See generally*,

Docs. 14-4, p. 13; 14-6, p. 8; 14-7, pp. 3–4; 14-8, pp. 8–9, 12.). Fatal to Gosa's

claim is the fact that she cannot point to any evidence—direct or

circumstantial—to demonstrate the first coaching was related to her race.

Both she and Ms. Jackson are African-American females, and the record does

not support any finding that other Wal-Mart employees in Store 700 or in the

local region acted in this manner to merit a similar coaching or that Gosa's

behavior did not merit the coaching.

The second coaching, given in November 2014, concerned Gosa's

breach of Wal-Mart policy relating to the removal of personal health

information (PHI) of patients from the pharmacy at the end of her shifts.

Gosa admitted to removing her notebook containing PHI from the pharmacy,

although she avers she never allowed others to access the information.[6] On

its face, it appears Wal-Mart followed its internal procedures to issue a

second coaching for a clear violation of its PHI policy. Further, the evidence

suggests Wal-Mart indiscriminately investigated other possible PHI policy

violations. Although Gosa alleges Wal-Mart did not coach others for similar

infractions until she pointed out the disparity, the record more clearly

---

[6] Gosa fruitlessly argues about the commonality of this practice in
pharmacies and insists she did not allow any HIPPA breach to occur or
otherwise improperly handle PHI. This, however, is not the issue before the
Court. The issue is whether Gosa received a coaching for this policy violation
when her non-protected comparators did not.

establishes Gosa provided two names for investigation while she was being questioned. (*See* Doc. 14-4, p. 8). Once she informed Mr. Harris that Mr. Ezelle and Mr. Hubert—both Caucasian males—also kept notebooks, he immediately investigated those claims. *Id.* at 10. Wal-Mart then determined Mr. Ezelle violated policy, just as Gosa, but found Mr. Hubert did not violate the policy because he locked his notebook securely in the pharmacy when he was not working and shredded it when filled. *Id.* As such, Mr. Ezelle received a coaching for the same policy violation as Gosa.[7] (*See* Doc. 14-7, pp. 4–5).

Gosa received her final coaching in February 2015 for leaving the pharmacy unsecured while she reprimanded an associate in the Health and Beauty department. (*See* Doc. 13-4, p. 35). Despite Gosa's opinion that speaking to an associate about helping a customer qualifies as a business-related reason and thus does not violate POM 902, the evidence before the Court reflects that a policy violation occurred, that Gosa was appropriately coached for violating the policy, and that she acknowledged the policy violation occurred. As the Court has already stated, it is not within the

---

[7] Interestingly, Gosa concedes a Caucasian, male comparator received a coaching for the same policy violation. She argues that the manner in which Wal-Mart investigated the policy violations singled her out racially because she was approached in person in front of other staff while the two men were questioned over the phone. These arguments go beyond the bounds of Title VII, as the Court do not micromanage business practices and will not enforce a "civility code." *See English v. Bd. of Sch. Comm'rs of Mobile Cnty*, 83 F. Supp. 3d 1271, 1279 (S.D. Ala. 2015) ("Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the work place.") (internal citation omitted).

Court's purview to referee internal business disputes. *See English*, 83 F. Supp. 3d at 1279.

Further, the record again supports a finding that other pharmacists of different races and gender than Gosa were coached for the same policy violation. Vincent Azzarello, a Caucasian/Hispanic male, received two coachings for violations of POM 902, one of which occurred while he was working in Store 700. (Doc. 14-4, p. 6; 14-9, pp. 3–4). Mr. Harris also stated Kim Kurcz,[8] a Caucasian female in his district, also received coaching for violating POM 902. (Doc. 14-4, p. 6). He further testified he was unaware of any other situation in which a pharmacist had left the pharmacy unsecured and had not received a coaching.[9] *Id*. Thus, as a matter of law, the Court finds Gosa has presented no evidence that either she did not violate Wal-Mart policy or she was disciplined in a manner inconsistent with that of her similarly situated peers.

### b. The Prima Facie *Case: Evaluations, Pay, and Shift Assignments*

Gosa also claims her negative performance reviews were racially motivated, which impacted her potential pay increases, and scheduling preferences were given to her Caucasian colleagues. The Court will address each in turn.

---

[8] The name "Kurcz" is spelled as such in Mr. Harris's deposition but appears as "Kurucz" in his Affidavit (Doc. 14-11, ¶ 6).
[9] In his Affidavit, Mr. Harris identifies three additional pharmacists in his district who have been coached recently for a POM 902 violation. They are two Caucasian men and one African-American man. *Id*.

Gosa received annual and mid-year performance reviews during her tenure at Wal-Mart. In FY11, she received high marks at "Exceeds Expectations," but her performance generally declined over the subsequent years. In FY13, she received an overall rating of "Solid Performer," and the following year, Mr. Crane rated her as "Development Needed." Contrary to Gosa's claims that Mr. Crane rejected her as an African-American female in a position of leadership, the substantive body of his review, *see supra*, indicates he based his poor ratings on her behaviors irrespective of race and gender. He provided multiple non-racial reasons for his negative review, including Gosa's failure to attend departmental meetings and her failure to obtain her immunization license. While he did use the phrase "play the victim," he deposed he employs the phrase for people—regardless of race or gender—who react in a manner so as to deflect negativity or criticisms. (*See* Doc. 14-6, p. 8).

In FY15, Ms. Powe raised Gosa's overall rating to "Solid Performer," although Mr. Crane also added comments. Again, any reasons for a lower rating reflect Gosa's failure to obtain an immunization license and her perceived handling on interdepartmental conflicts. *See id*. After reviewing the evaluations as a whole, the Court notes a steady downward trend in Gosa's ratings from FY11 through FY15 and cannot find evidence of racial bias as reasons behind the lower ratings. Additionally, Gosa has provided no

evidence that these ratings negatively affected her pay increase or future promotions.[10]

Just as Gosa cannot demonstrate racial animus in her performance evaluations, she is unable to proffer evidence of racial bias regarding scheduling. The record amply demonstrates Ms. Spence received a religious accommodation not to be scheduled on Sundays. (Doc. 14-6, p. 5; Doc. 14-8, pp. 5–6). Further, Gosa failed to provide any evidence that she did not receive accommodations for her schedule. In her mostly-stricken Affidavit, Gosa states she had difficulty receiving time off for medical appointments and claims she reported this scheduling discrimination to the Wal-Mart Global Ethics hotline and to her managers. She alleges they did not investigate her claims. (*See* Doc. 21-4, ¶¶7–8). Without more, however, her unsubstantiated claims do not create a genuine issue of material fact.

Considering all of the evidence before it, the Court concludes Gosa has failed to carry her burden as to both the third element (Wal-Mart's treatment of similarly situated employees outside of Gosa's protected class) and the fourth element (causation). The record amply demonstrates Wal-Mart promptly investigated Gosa's and others' allegations of policy violations in an impartial manner, regardless of the protected status of the individual in question. Further, the events surrounding the coachings, including the

---

[10] Notably, Gosa was transitioning to PiC, as Ms. Spence became a part-time worker, when she resigned. (Doc. 14-12, ¶ 9). Further analysis of any disparate pay allegations will be addressed in a later section.

impetus for them, do not belie racial bias on the part of Wal-Mart's employees, including associates and management personnel. *See, e.g.*, *Bolton*, 47 F. Supp. 3d at 1350–51; *Flowers v. Troup Cnty, Ga. Sch. Dist.*, 803 F.3d 1327, 1340 (11th Cir. 2015). Further, a thorough examination of her annual evaluations indicates her one-time poor ratings resulted from business-related reasons rather than any racial animus. Finally, she failed to present any evidence of discriminatory bias regarding the scheduling process. As such, Gosa has failed to produce evidence creating a genuine issue of material fact and has failed to meet her burden establishing a *prima facie* case.

### c. The remaining McDonnell Douglas *Analysis*

Even if Gosa established a *prima facie* case of racial discrimination, she is unable to defeat Wal-Mart's offering of legitimate, non-discriminatory reasons for its adverse employment actions. As discussed comprehensively above, each coaching addressed a clear policy violation, and Gosa did not contest the incidents.  Further, Gosa cannot demonstrate the three coachings were merely pretext for Wal-Mart's or its employees' racial bias, as the record clearly demonstrates Gosa was not "singled-out" but was disciplined as other employees were. Her claims that Wal-Mart did not act until she complained of disparate treatment holds no water: Wal-Mart cannot discipline employees for acts of which it has no knowledge, and the record demonstrably reveals it took proper and prompt investigatory action into all of her allegations. Further, Gosa has provided no evidence of pretextal reasons behind her

coachings or performance evaluations. As such, Gosa's claim of racial discrimination under both Title VII and § 1981 must be denied under the single-motive analysis.

### 2. Mixed-Motive Analysis

The Court further finds Gosa has failed to meet the lower burden provided in the mixed-motive analysis. Under this framework, plaintiff must show her protected characteristic was merely a motivating factor for the adverse employment decision. *See Quigg*, 814 F.3d at 1239. In *Quigg*, the Eleventh Circuit found "[v]arious statements made by School Board members Nesmith, Morgan, and Hiers indicate that sex or gender-based bias was a motivating factor in their votes against [plaintiff]." *Id.* at 1241. Gosa, however, cannot make the same showing. Her feeling that she was "tattled on" does not indicate a finding of racial bias, especially as those reporting her were mostly other African-American women. (*See* Doc. 14-5 p. 5; Doc. 14-4, p. 15). Further, the record shows that Mr. Crane's view that Gosa was "insubordinate" did not result from any personal feelings regarding race or gender; rather, the record emphatically indicates Gosa did not react positively to his leadership by not attending departmental meetings and by not obtaining her immunization certificate. *Compare with Quigg*, 814 F.3d at 1241–42 (finding school board members' making gender-specific remarks regarding plaintiff's job position offered circumstantial evidence of gender-bias as a motivating factor).

28

After reviewing the evidence as a whole in the light most favorable to Gosa, the Court cannot find she has presented circumstantial evidence suggesting race-based bias played a motivating factor in the adverse employment actions taken against her. As such, Wal-Mart's motion for summary judgment as to racial bias under Title VII and § 1981 is due to be **GRANTED**.

## B. Retaliation under Title VII

Title VII prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice[.]" 42 U.S.C. § 2000e–3. Under the *McDonnell Douglas* framework, a plaintiff must first raise an inference of retaliation by establishing a *prima facie* case. *See Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir. 1997)). To establish a *prima facie* case of retaliation under Title VII, "the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).  If a plaintiff makes out a *prima facie* case of retaliation, the Court then applies the burden-shifting framework as laid out above. The parties agree the coachings constituted an adverse employment action. As such, only the first and third elements are contested.

Gosa contends she made repeated verbal and written complaints of discrimination, but Wal-Mart denies she ever alleged racial (or gender) discrimination in her complaints. On March 3, 2015, Gosa wrote to Mr. Souers, "As I stated in my acknowledgement on 2/9/2015 Jean Spence , [sic] and Greg Crane have left the pharmacy unsecured and shopped for personal items. Why am I being treated differently?" (Doc. 21-6, p. 2). Further, she wrote to Ms. Powe on April 17, 2015, "[Mr. Crane's] leadership and relationships clearly maintained the hostile environment and fostered a feeling of him showing favoritism between he and others in the pharmacy. He expressed in a meeting in June with Amanda that 'I was not a bad person[,]' so he had some person feeling about me early on." *Id.* at 3. She also wrote she found it "disrespectful" that she was "left out" of the hiring decision-making process in March 2015. *Id.* at 4. As a whole, these statements do not rise to the level of protected speech under Title VII. Gosa's e-mail regarding Mr. Crane's feelings about her "plainly reflect[ ] a personal rather than a [race]-based bias." *See Black v. Reynolds*, 150 F. Supp. 3d 1273, 1281 (S.D. Ala. 2015). As this Court has previously noted,

> "[T]o be classified as statutorily protected activity the complaint needs to at last say something to indicate discrimination is at issue." *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 814 (7th Cir. 2011) (internal quotes omitted). "Although an employee need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, she has to at least say something to indicate her gender [or race] is an issue." *Sitar v. Ind. Dep't of Tranps.*, 344 F.3d 720, 727

(7th Cir. 2003). Simply complaining that one feels "picked on" will not suffice. *Id.*

The Eleventh Circuit has not so held in a published case, but it has come to the same conclusion in unpublished opinions. *See Demers v. Adams Homes, Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) ("T]o engage in protected activity, the employee must still, at the very least, communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred.") (internal quotes omitted); *Jeronimus v. Polk County Opportunity Council, Inc.*, 145 F. App'x 319, 326 (11th Cir. 2005) (a complaint "of being 'singled out,' being subjected to 'a campaign of harassment,' and working in a 'hostile environment' . . . did not amount to protected conduct" where it "never suggested that this treatment was in any way related to [the plaintiff's] race or sex"). Most plainly, "[a] complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (internal quotes omitted). This Court has recognized that, in light of *Murphy*, "[t]he law is clear." *Roberson v. BancorpSouth Bank, Inc.*, [No. 12–699–WS–N,] 2013 WL 6254108, at *10 (S.D. Ala. 2013).

*Id.* at 1281. Guided by its precedent, and that of the Eleventh Circuit, this Court must conclude Gosa did not engage in protected activity. She did not explicitly or implicitly communicate her belief that she was being discriminated against because of her race.[11] As such, her retaliation claim necessarily fails. Wal-Mart's motion for summary judgment must, therefore, be **GRANTED**.

---

[11] The Court also notes Gosa complained of being called "old [and] backwards" and endured "insults about my age," among other things. (*See* Doc. 14-3, pp. 14, 21). These allegations hold no sway over this Court, as Gosa did not plead age discrimination in her Complaint.

**C. Sex Discrimination under the Equal Pay Act and Title VII**

Gosa pled sex discrimination only under the realm of the Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA"). Wal-Mart, however, read her claim as also including a claim for sex discrimination under Title VII. The Court will proceed in that vein. "Discrimination claims under Title VII are analyzed using the same *McDonnell Douglas* burden-shifting framework as § 1981 race discrimination claims." *Kosher v. Protective Life Corp.*, No. 2:11–3915–JHE, 2015 WL 1395896, at *15 (N.D. Ala. Jan. 13, 2015). "EPA claims use a similar analysis but statutorily shift the burden of persuasion along with the burden of productions." *Id.*

**1. Pay Equity under the Equal Pay Act**

The EPA provides,

> No employer [subject to this section] shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* that an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1). "To establish a *prima facie* case under the Equal Pay Act of 1963, a complainant must show that an employer pays different wages

to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992) (internal marks omitted). Once plaintiff establishes this, "the burden shifts to the employer to prove that the difference in pay is justified by one of the four exceptions" stated in the Act. *Id.* Notably, the EPA "prescribes a form of strict liability: Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential. If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent on the part of the defendant." *Id.* at 1533.

To begin, a plaintiff must "compar[e] the jobs held by the female and male employees, and [show] that those jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs." *Miranda*, 975 F.2d at 1533. Further, "[t]he prima facie case also focuses solely on the primary duties of each job, not duties that are incidental or insubstantial. Any extra duties that might be used to distinguish two jobs may not be tasks that are typically performed by other personnel at lower pay." *Id.* Most importantly, job titles, while entitled to some weight, are not controlling; rather, the Court must look to the "actual duties the respective employees are called upon to perform." *Id.*

33

Gosa worked, for the majority of her tenure at Wal-Mart, as a Staff Pharmacist. From 2006 through 2007, she served in a higher position as the Pharmacist in Charge. Ms. Powe described the duties of a Staff Pharmacist, which include "fill[ing] prescriptions and consult[ing] customers about medications" as well as "exercise[ing] supervisory authority over all operations in the pharmacy." (Doc. 14-12, ¶ 3). Ms. Powe also indicated, "Pharmacy Managers are paid more than Staff Pharmacists because of their additional responsibilities." *Id.* at ¶ 11. Gosa appears to concede that Pharmacy Managers and Staff Pharmacists do not hold comparable jobs. (*See* Doc. 21, p. 23). Rather, she contends the role of Pharmacist in Charge and Pharmacy Manager is substantially equal, despite the pay disparity. *Id.* In its brief, Wal-Mart appears to concede this point. As such, the Court considers Plaintiff has met her burden, and the burden shifts to Wal-Mart to establish an exception to the EPA.

Wal-Mart argues the fourth exception, "a differential based on any other factor other than sex," applies in this case. To support this argument, Wal-Mart submits evidence that multiple factors outside of gender impact all pharmacy employees, regardless of title. Wal-Mart hires both new associates and lateral hires. (Doc. 14-11, ¶ 8). When hiring laterally, Wal-Mart must consider the applicant's current salary. *Id.* In addition, Wal-Mart considers "fluctuations in the job market" and the skill and experience of an applicant when making salary determinations. *Id.*; *see also* Doc. 14-12, ¶¶ 11–12. When

a Staff Pharmacist is elevated to Pharmacist in Charge, generally a temporary position, his or her pay is only increased by one dollar per hour; once a Pharmacist in Charge returns to the Staff Pharmacist position, his or her salary is reduced to the original amount. (Doc. 14-12, ¶ 11). Gosa claims she earned $62 per hour (although she provides no evidence of this). (*See* Doc. 21, p. 24). She also provided a mathematical breakdown of salaries into hourly equivalents for other employees, but the Court rejects these figures because the employees stated their pay as annual salary rather than as hourly employees.

As this Court has noted, "'[P]rior pay plus experience establishes an affirmative defense under the EPA.'" *Joyner v. Town of Elberta*, 22 F. Supp. 3d 1201, 1208 (S.D. Ala. 2014) (quoting *White v. ThyssenKrupp Steel USA, LLC*, 743 F. Supp. 2d 1340, 1354 (S.D. Ala. 2010)); *see also Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995) ("While an employer may not overcome the burden of proof on the affirmative defense of relying on 'any other fact other than sex' by resting on prior pay alone . . . there is no prohibition on utilizing prior pay as part of a mixed-motive, such as prior pay *and* more experience."). The evidence supports Pharmacy Managers' salaries incorporated both prior pay and prior experience. In addition, both Mr. Harris and Ms. Powe reveal an across-the-board pay increase of one dollar per hour when a Staff Pharmacist takes on the temporary role of Pharmacist in Charge. The mere fact that two women held the position (both Gosa and Ms. Spence) does not

indicate gender bias in the payment disparity between Pharmacist in Charge and Pharmacy Manager. As Mr. Harris noted, the current Pharmacy Manager at Store 700 is an African-American female, and she is a high paid pharmacist in his region. (*See* Doc. 14-11, ¶ 9). Thus, as a matter of law, the Court finds Wal-Mart has met its burden in demonstrating factors other than sex explain any pay disparity.

### 2. Sex Discrimination under Title VII

As with claims of race discrimination, Gosa must establish a *prima facie* case, showing (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) her employer treated her differently than similarly situated male employees, and (4) a causal relationship between her protected status and the adverse employment action. *See Valdes v. Miami-Dade College*, 463 F. A'ppx 843, 845 (11th Cir. 2012). The familiar *McDonnell Douglas* framework applies equally here.

Wal-Mart argues, and the Court agrees, the same substantive facts and analysis controlling her race discrimination claim govern the outcome of Gosa's sex discrimination claim. To conserve judicial resources, the Court will not repeat its prior analysis. The record sufficiently demonstrates similarly situated male comparators received coachings for committing the same violations as Gosa for both the PHI policy violation and the POM 902 violation. (*See*, *supra*).

36

Regarding her pay, she once again cannot establish facts in the record creating a genuine issue of material fact. It is undisputed Gosa primarily worked as a Staff Pharmacist. For approximately one year, she served as the PiC for Store 700. The payment scheme for PiC is established by Wal-Mart: PiCs earn one dollar per hour more than their Staff Pharmacist rate. The temporary nature of the job, as well as the lack of required managerial experience, justifies the difference in payment between the PiC and Pharmacy Managers. Ms. Martin's high salary among Pharmacy Managers indicates neither race nor gender influence Wal-Mart's salary motives. For predominantly the same reasons as outlined as to Count II, this Court **GRANTS** Wal-Mart's motion for summary judgment as to Count IV.

Having addressed Gosa's three federal law claims, the Court turns its attention to her State law claims.

## V. Analysis of Gosa's State Claims

Gosa also pled two state claims for breach of contract (Count I) and wrongful termination (Count V). For the reasons below, Wal-Mart's summary judgment motion is due to be granted.

## A. Breach of Contract

In Gosa's first cause of action, she claims Wal-Mart breached her employment contract. Gosa, however, readily admits she did not have an employment contract with Wal-Mart and acknowledges her status as an at will employee. (Doc. 14-1, pp. 8–9).

> By now, the rule is well settled in Alabama that an
> employee contract at will may be terminated by either
> party with or without cause or justification. *See, e.g.,*
> *Meeks v. Opp Cotton Mills, Inc.*, 459 So.2d 814 (Ala. 1984);
> *Hinrichs v. Tranquilaire Hospital*, 352 So.2d 1130 (Ala.
> 1977). This means a *good* reason, a *wrong* reason, or *no*
> reason. *Hinrichs, supra.*

*Hoffman-La Roche, Inc. v. Campbell*, 512 So.2d 725, 728 (Ala. 1987)

(emphasis in the original). To establish a contract, rather than at-will

employment terms, governed her employee relationship with Wal-Mart, Gosa

must establish: "(1) that there was a clear and unequivocal offer of lifetime

employment or employment of definite duration; (2) that the hiring agent had

authority to bind the principal to a permanent employment contract; and (3)

that the employee provided substantial consideration for the contract

separate from the services to be rendered." *Id.* (internal citations omitted).

Gosa has provided no evidence of a contract but argues that the job

description and the employee handbook created a contract. This argument,

however, cannot stand. Neither the job description nor the handbook offer

any terms of tenure or have the "authority" to bind Wal-Mart into an

employment contract. Moreover, Gosa cannot demonstrate she provided

anything more than "the services to be rendered." As such, she cannot prove a

claim for breach of contract.

   Gosa argues this Court should depart from established Alabama law to

create an exception. This Court declines to do so: "[The Alabama Supreme]

Court has repeatedly refused to modify this [employment at will] doctrine

even so much as to recognize a so-called *public policy* exception to its

application." *Campbell*, 512 So.2d at 728 (emphasis in the original). As such,

Wal-Mart's motion for summary judgment must be **GRANTED**.

## B. Wrongful Termination

In Gosa's final claim, she seeks "an exception to the at will

employment [doctrine] when an employee is terminated for complying with

state and federal law because a society under the rule of law demands such."

(Doc. 1, p. 16, ¶ 47). This argument, however, runs contrary to established

precedent, which Gosa concedes. Regarding a public policy exception, the

Alabama Supreme Court has held,

> We also note [plaintiff's] suggestion that we should carve
> out a public policy exception to the employee-at-will
> doctrine; however, we again decline to modify the
> employee-at-will doctrine by recognizing such an
> exception in this case. Historically, this Court has
> deferred to the judgment of the legislature as to the need
> for such an exception. *See, e.g.*, *Howard v. Wolff
> Broadcasting Corp.*, 611 So.2d 307 (Ala. 1992), *cert.
> denied*, 507 U.S. 1031 (1993), and the cases cited therein.

*Dykes v. Lane Trucking, Inc.*, 652 So.2d 248, 250 (Ala. 1994) (affirming

summary judgment despite plaintiff's argument that a public policy exception

should be applied because his company allegedly forced him to violate federal

law); *see also Hall v. Infirmary Health Sys.*, No. 06–791–WS–B, 2007 WL

772560, at *5 (S.D. Ala. Mar. 8, 2007) (acknowledging that "Alabama case

law erects an insurmountable obstacle to" a public policy exception to the at

will employment doctrine).

The Court liberally construes Gosa's pleading to include a claim for constructive discharge, which also fails. To make such a claim, "'the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a *reasonable* person in the employee's shoes would have felt compelled to resign.'" *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987) (quoting *Bourque v. Powell Electrical Manuf. Co.*, 617 F.2d 61, 65 (5th Cir. 1980) (emphasis in the original)). The Eleventh Circuit has held, "[p]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." *Id.* (emphasis in the original). The record does not evidence a genuine issue of material fact as to this standard. The impetus for Gosa's resignation was her frustration that she "had not received any kind of confirmation of" how an issue would be handled. (*See* Doc. X, p. X). Merely being "tired" of "[h]aving people show up in front of everyone and asking [Gosa] to do reports about situations" does not create working conditions that would compel a reasonable individual to resign. (*See* Doc. 14-2, p. 22). In fact, Gosa had previously filled out reports at management's request, and following the typical procedure for managing work-related disputes is not an unreasonable request or expectation. Additionally, Gosa informed the Alabama State Board of Pharmacy she resigned out of "[her] concern for the safety and wellness of the public." (Doc. 14-2, p. 26). As this Court has already determined Gosa's interdepartmental squabbles stemmed from personal, rather than race or

gender issues, it cannot find Gosa's resignation amounted to a constructive discharge. *See Henderson v. Leroy Hill Coffee Co., Inc.*, No. Civ. A. 99–1067CBS, 2001 WL 103147, at *10–11 (S.D. Ala. Jan. 30, 2001). Because this Court will not create a public policy exception contrary to precedent and cannot, as a matter of law, find Wal-Mart constructively discharged Gosa, Wal-Mart's motion for summary judgment is **GRANTED**.

## V. Conclusion

For the reasons stated herein, Wal-Mart's motion for summary judgment (Doc. 12) is **GRANTED**. A separate Order dismissing all claims with prejudice will be entered concurrently. Further, Wal-Mart's motion to strike (Doc. 27) is found to be **MOOT**.

**DONE** and **ORDERED** this 2nd day of February, 2017.

/s/  Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE